morning. 3-15-0132, City of Peoria v. Workers' Compensation Comm'n. May it please the court, my name is John Dundas, I represent the appellant for the City of Peoria. This matter involves an award by the Illinois Workers' Compensation Commission to the claimant, Charles Needham, of 10% loss of use of both arms for bilateral carpal tunnel syndrome. The claimant alleges that his condition was caused by a repetitive injury from his employment as a police officer with the City of Peoria. After other attempts, the claimant had made in this matter to find a... You said it's carpal tunnel or is it cubital? Carpal, I believe, obviously. I guess I'm misstating that. I do apologize. I had no idea it was cubital. Thank you. After the claimant had made other attempts in this matter to find an alleged causative factor from his work activities of his condition and those attempts failed, the claimant eventually rested upon an assertion that the manner in which he rested his elbows in his squad car caused his carpal tunnel syndrome. The issues before this court as to whether any award should have been granted to the claimant basically come down to two questions. One, did the claimant meet his burden of establishing that the accident date occurred within 45 days of the notice being provided to the City of Peoria? And did the claimant meet his burden of establishing whether or not his work activities was the cause of the factor of his condition? The record demonstrates that the claimant did not meet either of these burdens, and therefore the business decision should be reversed. Now didn't this really, I mean, in all candor, come down to a battle of the experts, I believe? Two experts lined up on the employer's side, two experts lined up on the claimant's side. Is that essentially correct? There's causation opinions going both ways? On the causation opinion alone, yes, that is true, Your Honor. We do have two efforts for opinions. I believe that that battle falls in favor of the City of Peoria. If you look at the two expert opinions that were provided by the claimant, one was by Dr. Williams. This, and I'll speak about this more when I go into the notice provision, which I believe is a completely separate issue and also dispositive in this matter. But the claimant had began treating for his symptoms back in approximately 2007. At that time, in at least March of 2007, he was claiming they were caused by his work activity, specifically referring to typing. He continued to treat that manner and attribute it to his typing at work until, up until the time he saw Dr. Williams, which was in 2010. At that time, Dr. Williams agreed with the claimant's assertion that it was caused by his typing at work, and that was his opinion. Following that, the City of Peoria received a records review by Dr. Hoffner, who is an orthopedic surgeon. In that opinion, Dr. Hoffner disputed cause of connection, and specifically stated the limited amount of typing that was done by the claimant could not have caused his… Well, I'm aware of the opinions that are conflicting, but why would we substitute our judgment for that of the Commission and decide that your experts are superior to the claimant's experts? Why would we do that? Because I believe the record shows that the expert's opinions from the claimant are not supported at all by the evidence. Both experts eventually came to the determination that it was caused by his resting of the elbows on his squad car. Despite the fact that both testified, they had never received a history from the claimant about how he rested his elbows on the squad car. They had never reviewed the squad car. Dr. Williams testified that he had no knowledge as to even how, what portion of his arms would be resting on any portion of the squad car. All right, so in essence, you're saying the foundation upon which his experts provided their expert opinion was somehow flawed? Yes, sir. They were missing some important facts? They were missing any basis. They claimed that the way he rested his arms in his vehicle caused it, but both were very clear in their testimony. Well, that's not all that Williams said. Williams said the primary factor was his typing. Dr. Williams actually dropped off on that fairly hard. And there's a quote, I believe it's in our plywood vehicle, it's very serious, where he says it is not the typing, that he believes it is much more the manner in which he rested his elbows on his car. So he didn't say that typing was the primary factor? He initially did. Okay. That was his initial decision. Then he changed it to, after that was shown to be incorrect and impossible by Dr. Hoffner, he changed it to some intermittent duty that the claimant had done years prior as a sniper. But that was a very occasional activity and had been many years before, not supported by the record. Then Dr. Williams came with this, the resting of the vehicles, the elbows in the vehicles. Again, this was despite having any knowledge from the claimant on how he rested his elbows in his vehicles, not having reviewed the car, not having any history changed from the claimant. By the time he made that, he changed his opinion to that. And, again, in his deposition, he made the very clear. The arbitrator discounted the opinion of Hoffner because he never examined the claimant. Is that not the case? He did not? Neither did Dr. Fletcher. Well, you understand that, but I'm just asking about Hoffner. And he disagreed with Garns and Williams as to the diagnosis of the treatment  Pardon me. He relied upon the causation opinions of Garns and Williams, which he found to be credible. So I suppose the question I have is, who gets to decide when there's conflict in medical testimony? I believe the court has to look at the evidence. We weigh the evidence? This is a question of law and fact. Wait a minute. I don't understand what the question of law is. Whether or not the opinions meet the standard to prove causation. That's not a question of law. That's generally a question of fact. I mean, it's a manifest weight standard. But if there's any credible evidence in the record to support the commission's decision, we have to affirm it whether we would have decided it the same way or not. We don't weigh evidence. Because all we do is make a determination as if there is any. Your Honor, in the manifest weight standard, I believe there is not credible evidence. Once again, the basis of their opinion is that it was based on how he rested his arms in his vehicle during a squad car. And there's absolutely no evidence they had any knowledge of how he rested his arms in the vehicle. In fact, they both testified, both Dr. Fletcher and Dr. Williams testified, that they had no knowledge as to how he actually rested his elbows in that vehicle. And you mentioned, Dr. Hoffner, the fact that he had not examined the claimant. What Dr. Hoffner did have was a job analysis report that was provided by a nurse practitioner, but she did go out, reviewed the squad car, reviewed the claimant's work activities, and determined they were not causative factors to this. Were these arguments presented in front of the commission? They were, Your Honor. I also want to point out that we do have a very clearly erroneous decision, something that Your Honor just mentioned by the commission. They state that Dr. Darst rendered an opinion as the causation, and that's simply not true. They referenced some intake forms that were made when the claimant did go see Dr. Darst. Those intake forms, Your Honor, were very clear, were prepared by, and on the histories given by the claimant, not by Dr. Darst. The timestamps on them make it very clear that they were prepared prior to the claimant seeing Dr. Darst. The claimant's own witness, Dr. Williams, testified that those reports, the intake forms, were prepared by the claimant and only reviewed by Dr. Darst. The notes themselves, as well as Dr. Darst's treatment reports, note that those were prepared by the claimant and the histories given by the claimant, and he had only reviewed those. And finally, it's inconceivable that Dr. Darst would have prepared a causation opinion prior to ever seeing the claimant on an intake form. No point anywhere in this matter to Dr. Darst ever giving a causation opinion. He was not called to testify at arbitration. Additionally, the reports that we put forth by Dr. Hoffner and Dr. Moody are very strong in favor of lack of causational opinion. They state that all the peer-reviewed literature in there that's out there as far as carpal tunnel syndrome is that Again, this is cubital tunnel. I apologize, this is cubital tunnel. Isn't it? It is, Your Honor. Okay. But in an agency, all the peer-reviewed literature states that cubital tunnel cannot be caused by arresting their vehicles. They state that they had the nurse's practitioner's report, which states that there was not sufficient force to cause cubital tunnel by the arresting of the vehicles, by the arresting of the arms of the vehicle, and that the only way this kind of pressure could possibly cause cubital tunnel syndrome is if a person overrode their mechanisms of self-preservation. Basically, they would have to be pushing down so hard and causing themselves such great discomfort. That's the only way cubital tunnel could possibly be caused by this, and there are reports that dispute the finding of causation. In addition to causation, one of the main issues here is notice. It's undisputed that the claimant began treating for asymptoms back in 2007. February 2007, JSK Chiropractic reports show that he had began treating for cubital tunnel syndrome then. In March of 2007, the claimant was reporting to JSK that these were caused by his work activities. He had some suspicions, okay, that his symptoms might be related to employment, that he had this condition, but it wasn't until he went to Garst that it was confirmed by medical testimony, correct? Dr. Garst never confirmed that. There was no confirmation by Dr. Garst. All right, but what happened on October 30th, 2009? That happened to be the day that he was referred to Dr. Garst. Now, this was not even the time he originally went to go see Dr. Garst. I mean, originally he went to see a doctor even close to that time. We have about three years of treatment, always attributing it to it, and we have the claimant's own testimony stating that by February 2007, it was apparent to him that his condition was caused by his work activities. But is that really the test? I mean, we're looking at Duran. Isn't it a flexible standard? It isn't just because somebody believes they may have this condition and maybe work with it. Is that all that is required? For a manifestation date on repetitive activity, it is when it becomes apparent to a reasonable person both the fact of the injury and the causative factor of the injury was work-related. That is the standard in this case. The claimant's own testimony was that it became apparent to him back in 2007. Doesn't Duran say our courts typically uphold various factors which set the manifestation date as either the date on which the employee requires medical treatment or the date on which the employee can no longer perform work activities? Isn't that a quote from Duran? That is true, Your Honor, but October 30th is neither of those dates.  Why did he go to DARS on October 30th, 2009? He went to see Dr. Hickock sometime prior. That was in the claimant's testimony in June of 2009, although it is nowhere in the records. Approximately June of 2009, he started to have worsening conditions. At some point, he went to see Dr. Hickock. Again, his record is not put in there. But he went to see Dr. Hickock in addition to JSK Chiropractic prior to seeing Dr. Dars for these symptoms. Okay, so you're dodging the question. What happened at DARS' office on October 30th, 2009? What happened that day? He was reviewed by Dr. Dars. Dars looked at him. He did not make any causation opinions, did not say it was work-related, made no relevant decisions. Nothing happened October 30th, 2009, which is relevant to the causation date. It was the second appointment with Dars where the first time his employment activities were limited by a doctor, weren't they? This was after the actual actual notice was filed. That was on, I believe, December 10th, 2009, which was the day the notice was provisioned. It was the very first time any doctor ever limited his work activities, the second appointment with Dars. Yes, I believe that was December 4th, 2009. I think that is correct. And it was not that time there was any kind of limitation on it. It is important to note that that's also not indicative of causation. Dr. Moody also suggested that the claimant discontinued the use of the squad car computer that day, didn't he? Yes, Your Honor. And that's dealt with in Dr. Moody's report and his testimony, that causation and what causes symptoms are not necessarily the same thing. That certainly if somebody says you have discomfort while typing, you tell them to stop typing. And that is what Dr. Moody goes into pretty good detail in his deposition. You seem to have a section in your brief that attacks the 10% loss of use of each arm pursuant to AD, but you don't cite a single case in support of the proposition. Isn't that forfeiture under 341? We put a very brief out there, Your Honor. We're leaving that brief live. Our main issue is that there should have been no award involved at all. There should have been no award. So you accept forfeiture? Excuse me? You accept forfeiture on that? We do, Your Honor. If there is an award, we are not speaking to it. That's fair. Once again, the notice provision, again, what happened on October 30, 2009, absolutely nothing that establishes a manifestation date. This is not the date. The thing to look at is the state that became apparent to the claimant. The claimant's own testimony was that it was three years before. His medical history indicates that three years prior to that. Again, leading up to October 30, that was not the date. He had been referred to another doctor that he went to see for additional treatment relating to the systems prior to October 30, 2009. This is not the date he went down and broke down and finally saw a doctor for this. He'd been treating him for two to three years. He'd gone to see another doctor, Dr. Hickok, for these symptoms prior to seeing Dr. Garst. All that happened was Dr. Hickok referred him to Dr. Garst, and that happened the day that Dr. Garst was able to see him. Nothing else happened on that date. Again, this is not the date that the claimant was no longer able to work. He continued to work after that time. Again, it wasn't until he saw Dr. Garst several months later that he had any sort of limitations put on his work. So, again, absolutely nothing happened on that date that leads to the manifestation date. You mean October 30th? Yes, October 30, 2009. That happened all prior. There's absolutely no evidence there. And interestingly, the claimant throughout the entire course of this litigation, up until the time of the arbitration, relied on a separate date. His original application for claim, his first and second amendment, all stayed October 9, 2009. It wasn't until the day of the arbitration that the claimant first asserted anything about an October 30, 2009 date. And that's the only argument he ever makes, that October 30th is the accident date. He simply says that the city did not object to that amendment. The issue here is not that we don't believe he should have been able to amend. It's not a procedural issue. The fact that we allowed him to amend, that's fine. He still has the duty of putting forth evidence to establish that accident date, which he had put forth none of this matter. I see my time has expired. You'll have time to reply. Thank you, Your Honor. May it please the Court, my name is Steve Kelly. I represent Officer Needham in this case, counsel. If I can address some of the points that were brought up during argument. Yeah, would you address that last point? I sure will, the amended of the application. At the time of hearing, I reiterated that the application had been amended to the arbitrator at the hearing. But if you look at the amended application, it's actually dated December 2012. It was filed with the Commission. It was filed with the Commission of the amended application. It had been amended seven months prior to hearing. As a matter of course and courtesy to the Court and to the other side, I said, Your Honor, I want to bring to your attention, there's been an amended to the application. Sometimes the arbitrators aren't aware that the application's been amended. I said it's been amended. There was no objection at time of hearing to the amendment of that application. So within the rules of the Commission, I was allowed to amend it. We did it seven months prior to hearing. I reiterated at time of hearing, and it was discussed, no objection. We moved forward with the hearing with the accident date being in this case, October 30, 2009. If I can address the argument in kind. Can you? We have a director right here. Okay. So that's October 30th. But what was underlying the October 30th? Why October 30th? Yes. Why the date was picked for the accident? Yes. This is a case that clearly shows that Officer Needham knew he was having problems while working as a police officer. And you can see as the history goes on, he knew it was something to do with work, but couldn't quite pinpoint what was going on. His arms and elbows were bothering him while he was working. Under Duran, it makes sense. He's not a person who knows cubital tunnel, what causes it. He starts voicing complaints. The doctor is leading up to the 2009, June 2009 to October 2009. And his testimony establishes this. He says, it's getting worse. I'm starting to have numbness and tingling in my hand. October 30th, 2009 is the date that he was sent to the specialist, Dr. Garst. And if you look at the intake form of Dr. Garst, in any case where Officer Needham is filling out the form and it says, I have problems with work, and yes, I believe it's related to work. He fills that out. I picked that date because in his mind, according to Duran, he felt he had a work-related condition. And according to Duran, he felt it was a condition that needed orthopedic care. It's the first time he needed orthopedic care. And he even testified at trial. It's that moment that he said, it's that moment I knew I need help. I needed medical help. Otherwise, I was going to have problems doing my work. He testified to that back at time of trial. So under Duran, it talks about flexible appearance. And under Duran, once a reasonable person knows that they have a condition that may be related to work where they need the help, that's the date. If you look at the intake form, October 30th, 2009 is the date he said, I need help. I'm getting an orthopedic surgeon. I need this taken care of. If you look at the form 45 in the action reports, kind of vague of how it's filled out, it says October 2009. It doesn't give an exact date, which supports the theory behind the idea behind Duran. It's the fact that a reasonable person sitting in a squad car may not know that extrinsic pressure, putting your elbow on a hard surface, could cause or at least aggravate the symptoms to make him more symptomatic. And that's exactly what's going on here. So to answer your question, Your Honor, it's the date he went to Dr. Fletcher, and as he testified, it's the date in his mind he said, I need orthopedic help. I need help with this because it's not getting better. He knew throughout the history of this case, it was something to do with work. But he could not pinpoint it. And in fact, the affluent takes a nurse, a medical nurse, to his squad car, sits down with him and says, show me how you do your work. And even then he was uncertain what was causing it. We talk about this causation argument. We talk about what the doctors knew and didn't know. Please look at Dr. Fletcher's testimony. It describes this squad car. It is a confined space. It has a computer. It has a resting point for the arm for the officers to use the computer. It also has a hard surface. And this job analysis talks about these officers are in the car six to eight hours a day. And they get a new computer system. Officer Needham identifies he's not a typist. So he is working on the computer, resting his arm, rotating over to the computer, and also resting his elbow on the window sill. Dr. Fletcher discussed Trucker's elbow. We've heard of it. They rest their arms on hard surfaces, don't know about it, and it entraps the nerve. Dr. Williams, the treating physician in this case, the surgeon, confirmed this. He said, look, Trucker's elbow exists. There's an extrinsic pressure. And people don't understand that's what's causing the problem. Dr. Hoffner is interesting. He's the only doctor in this case that says, I don't believe in extrinsic pressure. It doesn't exist. But that's funny because the company doctor, Dr. Moody, said, yeah, that does exist. He testified to that. Dr. Fletcher, it does exist. Well, while you're on that topic, counsel seems to be emphasizing his belief that your experts' opinion was flawed. They were missing important foundational information. And his experts were superior to yours. Clearly, he says, and therefore, the commission's finding was flawed. What do you say to that? I disagree. I think the standards against the man best weigh the evidence. I believe the commission has the ability to weigh the evidence. And as it's presented to you on appeal, I believe that if there's any evidence to support the commission's decision, you would affirm that. I understand the general rule. But obviously, you're not conceding that your experts were missing foundational elements. I'm not conceding that, no. My experts, first of all, Dr. Williams. Dr. Williams is a board-certified orthopedic surgeon. He's been doing it for 20 years. Cites the British Journal about this type of extrinsic pressure. He knew, got the information, he saw the information and said it was work-related. Dr. Fletcher, he testified he used to work for police departments throughout the state. He said that other police departments took him to squad cars, sat him in there, and he worked in there. And he said, it's a confined space. It's not your normal car. What about the nurse that they hired during her cross-examination? Look how she testified. She acknowledges very reluctantly. I asked her a lot of questions about her conclusion in the job analysis study. She said, in her study, police officers don't lift over 26 pounds. I said, is that true? And she says, well, that's the information the city gave me. I go, well, let's put that aside. Is it true? Is it your opinion here to the judge today that officers do not lift more than 26 pounds? She says, well, that's the information I was given. I go, well, do you agree with that? Maybe not. So then we start going a little bit more into the job analysis study. And Dr. Fletcher saw this study. And the job analysis study talked about these officers are in this squad car, seven, eight hours a day, and she conceded that they could put weight and pressure on the elbows. And the funny thing is, she disagreed with Dr. Hopner at testimony. She said, I believe, I've heard of it, Tucker's elbows exist. So this is a case on causation. It's not against the manifest way of the evidence. There's evidence here to support our position. And as it relates to notice, my client gave notice within 45 days. There was no objection to the amending of the complaint. And the date he picked is consistent with Duran. And according to Duran, flexible and fairness. And we had asked that you affirm the decision of the lower court. Thank you. Thank you, Counselor. Counselor, you may reply. First of all, as to the amended application, I was not the attorney of the arbitration. My understanding, it was on the day of. If that's incorrect, I apologize for my factual error. However, it doesn't change the legal analysis. The issue is not that the amendment was made. What objected to that is that he never established his burden following that. And that is what our issue is. As to the notice date, he clearly states that he knew going before he saw Dr. Garz that it was work-related. His apparent issue as far as why Dr. Garz could be the manifestation date, he states it's because he wasn't aware prior to that that extrinsic pressure was what caused it. First of all, there's no requirement they know the exact mechanism or where they come from there. It's just that they know that it was their faculty injury and it was related to their work. However, Dr. Garz never made the opinion that the extrinsic pressure was a causation opinion. In fact, Dr. Garz never talked about extrinsic pressure. That opinion did not come. He states it was not until it was pinpointed that it was extrinsic pressure that caused this cubital tunnel that the manifestation date occurred. That didn't happen until it was October of 2012 when Dr. Williams first suggested that. So he's saying the date would have been two years after the notice had ever been filed, two years after the application had been filed. That is not the manifestation date. The extrinsic pressure is not what establishes when the claimant became aware of both the fact of the injury and that it was caused by his work activity. We have evidence that goes back to March 2007 in the medical records and by his own testimony that he knew that in February 2007. Again, this is not the date he was referred to see an orthopedic surgeon. This is not the date that he broke down and realized he needed to see his orthopedic surgeon. He had already started seeking treatment from another doctor, Dr. Hickock, prior to this. Dr. Hickock referred him. It wasn't that on October 30th petitioner's claimant's condition worsened to the point where he felt he needed to go see an orthopedic surgeon. That's the date after being referred, after other treatment, Dr. Garza happened to have an opening for him to come in. And once again, his evidence testifies that when he showed up that day, had his intake forms, he was already aware that this was caused by an important condition. That was his opinion, his understanding, his longstanding understanding. Nothing happened on October 30th that changed anything about that. I'll speak about grant and the flexible standard here. But grant is also very clear that it has to be furnished to both sides. It's not just furnished to the claimant. It's also furnished to the claimant and the employer. In this case, we have absolutely no notice at all until December 10th of 2009, despite them being clearly aware back in 2007 that this was caused by a work activity. Basically, if it's allowed in this case, there's really no notice requirement involved. And the law is very clear that when there's absolutely a lack of notice, it's a jurisdictional bargain claim, and therefore the decision should be reversed. What's your understanding of the purpose of notice? It is to put the employer on notice. First of all, I mean, as a legal standpoint, it's to set jurisdiction. It's a jurisdictional bargain. No, no, no, policy. Policy. It's so that the employer can investigate the claim, make changes, do what they need to do to help the claimant. In this case, there were other causative factors that were out there. They could have eliminated, if supposedly his typing was causing the problem, they could have eliminated it back in 2007 if they were put on notice. And at that point, eliminate that as a possible cause. If there was any issues with work related, they could have investigated it back in 2007, put an end to that, and then if his condition were worse, we know that was not his employment causative factor. They were denied any opportunity to investigate. So it's based on an assumption the employer cares about his employees? I didn't write the book, but there was some assumption that, yes, Your Honor. If nothing else cares about their insurance policies, also, they're a premium. Well, this is being recorded, so you do want to say nice things. And the attorney is here, Your Honor, so I want to say very nice things, especially since he cares very deeply about their police department, Your Honor. Yes. Thank you, Your Honor. Thank you, counsel. Thank you, counsel, both, for your arguments in this matter this morning. It will be taken under advisement and a written disposition shall issue.